ELKO REALTY COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 60420. Filed February 28, 1958.

*Logan Morris, Esq.*, and *Joseph J. Pugh, Esq.*, for the petitioner.
*William J. Hagan, Esq.*, for the respondent.

TRAIN, *Judge:* The respondent determined the following deficiencies in the income taxes of the petitioner:

| | |
|---|---|
| 1951 | $8,656.15 |
| 1952 | 16,766.11 |
| 1953 | 22,369.83 |

The main question presented is whether the acquisition of certain corporations by the petitioner had as its principal purpose the evasion or avoidance of Federal income tax within the meaning of section 129 of the Internal Revenue Code of 1939.

### FINDINGS OF FACT.

Some of the facts are stipulated and are hereby found as stipulated.

The petitioner, Elko Realty Company, is a New Jersey corporation organized in 1923, with principal office at Wildwood, New Jersey.

The petitioner filed a consolidated return with Spiegel Apartments, Inc., and Earl Apartments, Inc., for 1951 with the then collector of internal revenue for the first district of New Jersey. Consolidated returns for 1952 and 1953 were filed with the district director, Camden, New Jersey.

The petitioner's charter authorizes it to engage in a wide range of activities, including owning, operating, managing, and insuring real estate. With the exception of owning and operating the two corporations whose acquisition is here involved, the petitioner was engaged exclusively in the real estate brokerage and insurance brokerage business during the years here at issue and those immediately preceding. Petitioner's business had been inactive from 1940 until the latter part of 1948.

The Spiegel Apartments, Inc., and Earl Apartments, Inc., were organized on October 25, 1948, and March 23, 1949, respectively, under the laws of the State of New Jersey, each to build and own a Section 608 Federal Housing Administration insured apartment project. Pursuant thereto, Spiegel Apartments, Inc., constructed an apartment house at Vineland, New Jersey, consisting of 48 units at a cost of $387,352.22 and Earl Apartments, Inc., constructed an apartment house at Vineland, New Jersey, consisting of 108 units at a cost of $876,815.07. The Federal Housing Administration, hereinafter referred to as F. H. A., guaranteed mortgages on these two projects in the amounts of $388,000 and $889,200, respectively. The Spiegel Apartments were approved for occupancy on May 10, 1949, and the Earl Apartments on December 12, 1949, by the Federal Housing Administration. Both projects were of brick construction and funds

were provided in their operating budgets, under the F. H. A. analysis, for maintenance so that it could be expected that there would not be very much depreciation in value over the approximately 34-year life of the mortgages.

The vice president and executive head of petitioner, Elko Realty Company, was Harold J. Fox, who had been an officer since at least 1948. Fox owned about 80 per cent of petitioner's stock and controlled it. Fox had had many years' experience in the real estate mortgage and related fields. He had been managing officer of a savings and loan association since 1926, and president and managing officer since 1937 of a private mortgage company, which was approved as an F. H. A. mortgagee. He controlled the Seaboard Fidelity Corporation and another company called Credit Rating Services.

Toward the end of 1950, Fox learned from a broker in Vineland that Spiegel Apartments, Inc., and Earl Apartments, Inc., were for sale and considered their acquisition. He did not see any operating statements or books of either corporation and was told that they were not available as the then owner of the two corporations, Harry Spiegel, kept only very informal and fragmentary records which were merged with his own personal records. With the possible exception of certain data concerning the degree of occupancy of the two apartment projects, Fox received no information from Harry Spiegel as to the overall financial condition of the two corporations. He did not seek or receive any information from F. H. A. as to the actual operations of either corporation because it was his understanding that F. H. A. does not disclose such information to a prospective investor but only to the mortgagee. He likewise did not seek or receive any such information from the mortgagees of the two projects. It was not until July 1951, some 7 months after his acquisition of their stock, that Fox saw firm figures of the operations of the two corporations.

Fox was a frequent visitor to Vineland, and both projects were well known to him. He knew of his own observation that both properties were fully occupied. On January 1, 1951, both projects were 100 per cent occupied, and both had substantial waiting lists. Harry Spiegel's rental agent prepared a report for Fox showing the rent being derived from each apartment. This agent did not have any information as to the financial condition of the two corporations.

Fox examined the project analyses prepared by F. H. A. with respect to the two properties. Such analyses are prepared by F. H. A. in connection with its determination as to whether or not a given project qualifies for a Government guarantee of its mortgage. In each case, the project analysis made a detailed estimate of income, annual operating expenses, including maintenance, taxes, and the annual mortgage payments including both interest and principal. In each case, the project analysis showed a net income in excess of all

expenses more than sufficient to meet the mortgage requirements. Based upon an occupancy of 93 per cent, as estimated by the F. H. A. analysis, the gross income expectancy in the case of the Spiegel Apartments was $43,245, total expenses and taxes $18,406, leaving an annual balance of $24,839 to cover annual payments under the mortgages, including both amortization and interest, of $21,339.96. Based upon the same estimated occupancy of 93 per cent, the project analysis showed a gross income expectancy in the case of the Earl Apartments of $91,557, total expenses and taxes of $30,542, leaving a net income balance of $61,015 to cover annual payments under the mortgage, including amortization and interest of $48,906. The analyses called for payments of a management fee, including rental commissions, in each case of 5 per cent of the gross profits. In addition, the analyses provided for insurance on which the commissions would be about $1,000 annually.

The project analysis of the Spiegel Apartments was prepared September 7, 1948, and that of the Earl Apartments was prepared February 9, 1949.

At the time he was considering acquisition of the two projects, Fox had received and was familiar with the annual report for 1949 of the F. H. A. The report showed, as of December 31, 1949, that a cumulative total of 5,190 Section 608 projects had been insured by F. H. A. Of this total, 5,083 mortgages were still in force. Eighty-four mortgages on completed projects were reported by lending institutions as being in default at the close of 1949. Lending institutions are required to report F. H. A. mortgages as being in default when a payment is 30 days delinquent. In addition, Fox had previously received and was familiar with the 1948 report of F. H. A. which showed a comparable picture of successful operation of Section 608 projects for that year.

On January 1, 1951, Fox acquired 324 shares of the common stock of Spiegel Apartments, Inc., and 440 shares of the common stock of Earl Apartments, Inc. The shares in question represented the only outstanding common stock of both corporations. Fox acquired the stock of the two corporations by arranging loans to each corporation for working capital and for loans to Harry Spiegel for the payment of accrued obligations in the total amount of $15,800, which was paid in cash on January 4, 1951, the date of settlement. The loans were made either by Fox personally or by the Seaboard Fidelity Corporation and the Credit Rating Services, both corporations controlled by him. Almost immediately after his acquisition of the stock, Fox transferred the stock to petitioner in exchange for 9 shares of petitioner's common stock having a stated value of $900. Petitioner entered on its books the stock received at $900, plus an account of $15,000 as an open account.

Petitioner's income in 1950 was about $10,000 or $11,000. At the time of its acquisition of the two corporations, petitioner had no contracts or exceptional plans which indicated it would realize abnormal income for the next few years. However, it hoped to grow. The city of Vineland, where petitioner's real estate and insurance business was located, was growing, and there was a demand for housing in the area that could not be met. Seaboard Fidelity Corporation had a net income during this period of between $35,000 and $50,000 a year, and Credit Rating Services a net income of approximately $20,000.

The operation of the two apartment projects by petitioner was unsuccessful. Earl Apartments, Inc., and Spiegel Apartments, Inc., were in financial difficulties and operating at a loss at the time of their acquisition by Fox and their subsequent acquisition by petitioner. Earl Apartments, Inc., was actually in default on its mortgage at that time. This default was occasioned by the nonpayment of principal installments for November and December 1949 as well as shortages in the tax and mortgage insurance premium accounts. Notice of this default was furnished F. H. A. on December 15, 1950, by the Bowery Savings Bank, mortgagee, through the South Jersey Mortgage Company, its mortgage-servicing agents. This notice of default assigned as the reason for nonpayment: "Income reduced due to rental concessions."

Fox knew that, of the approximately $16,000 paid to Harry Spiegel as part of the purchase arrangement, some $11,000 went to the mortgagee of the projects in payment of accrued obligations. He had drawn the checks so that they could be traced. Spiegel had told Fox that this was his own personal debt, and Fox considered Spiegel's business methods to be unorthodox. Fox also knew that about $2,000 of the $16,000 went in payment of a fuel bill of one or both corporations. Either Fox or petitioner caused the approximately $16,000, including the $11,000 which went to the mortgagee, to be entered on the books of the two acquired corporations as an account or accounts payable.

Fox was aware at the time that he acquired the stock of Earl Apartments, Inc., and Spiegel Apartments, Inc., that neither corporation had working capital. Petitioner loaned money, in amounts unknown, to the two corporations as working capital in the spring of 1951.

Spiegel Apartments, Inc., and Earl Apartments, Inc., sustained the following operating losses for the indicated years:

| Year | Spiegel | Earl | Total |
|---|---|---|---|
| 1951 | $7,706.91 | $23,679.35 | $31,386.26 |
| 1952 | 8,525.05 | 20,339.97 | 28,865.02 |
| 1953 | 23,814.20 | 23,862.47 | 47,676.67 |

Because of defaults under the mortgages, they were foreclosed in March 1954.

With regard to both projects in the years in question, the actual gross receipts were less than the gross receipts estimated by the F. H. A. project analyses. At the same time, actual expenses exceeded the F. H. A. estimates.

The following schedule shows the estimated gross receipts and certain of the estimated expenses as set forth in the F. H. A. project analysis of the Spiegel Apartments, the actual receipts, and certain of the actual expenses of the same project:

| | F. H. A. project analysis | Actual | | |
| --- | --- | --- | --- | --- |
| | | 1951 | 1952 | 1953 |
| Gross receipts (based on 100 per cent occupancy) | $46, 500 | $42, 054. 09 | $41, 937. 90 | $28, 119. 82 |
| Excess of analysis gross receipts over actual | | 4, 445. 91 | 4, 562. 10 | 18, 380. 18 |
| Heating and ventilating | 2, 958 | 6, 445. 38 | 8, 116. 11 | 6, 436. 92 |
| Lighting | 288 | | | |
| Water | 400 | 501. 34 | 946. 09 | 109. 67 |
| Maintenance | 2, 994 | 4, 129. 47 | 2, 127. 07 | 8, 465. 28 |
| Taxes | 5, 398 | 7, 697. 70 | 7, 654. 80 | 8, 983. 08 |
| Payroll | 1, 800 | 4, 562. 64 | 1, 581. 50 | 1, 040. 00 |
| Sewer | | 149. 63 | 149. 63 | |
| Total of above expenses | 13, 838 | 23, 486. 16 | 20, 575. 20 | 25, 034. 95 |

The following schedule shows the estimated gross receipts and certain of the estimated expenses as set forth in the F. H. A. project analysis of the Earl Apartments, the actual receipts, and certain of the actual expenses of the same project:

| | F. H. A. project analysis | Actual | | |
| --- | --- | --- | --- | --- |
| | | 1951 | 1952 | 1953 |
| Gross receipts (based on 100 per cent occupancy) | $98, 448 | $85, 321. 72 | $93, 210. 21 | $88, 325. 02 |
| Excess of analysis gross receipts over actual | | 13, 126. 28 | 5, 237, 79 | 10, 122. 98 |
| Heating and ventilating | 7, 128 | 12, 719. 58 | 16, 659. 56 | 14, 517. 88 |
| Lighting | 648 | | | |
| Water | 865 | 561. 50 | 987. 23 | 358. 19 |
| Maintenance | 5, 251 | 9, 040. 16 | 9, 955. 14 | 16, 029. 57 |
| Taxes | 5, 145 | 16, 216. 86 | 11, 757. 12 | 13, 708. 40 |
| Payroll | 3, 300 | 7, 120. 00 | 4, 126. 25 | 3, 860. 00 |
| Sewer | | 3, 060. 00 | 2, 160. 00 | 1, 080. 00 |
| Total of above expenses | 22, 337 | 48, 718. 10 | 45, 645. 30 | 49, 554. 04 |

The turnover of tenants in both projects was higher than normal due to the increasing ease of home ownership in the area. Higher maintenance, including redecorating, costs were one result of this turnover. Occupancy in both projects was reduced by the necessity of redecoration. Gross receipts were also reduced in the case of the Earl Apartments by reason of the fact that, for at least a portion of the period in question, the rental level was lower than the level called for in the F. H. A. project analysis. On the other hand, at some point during its operation of the two projects, petitioner sought and obtained a slight increase in rents in at least one of the projects.

The F. H. A. project analyses provided for a limited operating payroll in the case of both projects. In the case of Earl, the analysis called for 1 janitor and 1 helper at a combined annual payroll of $3,300. In the case of Spiegel, the analysis called for 1 handy man and 1 part-time helper at a combined annual payroll of $1,800. In September 1951, on the occasion of an inspection by an F. H. A. construction examiner, the combined payroll included a project manager at the Earl Apartments and a 5-man maintenance crew working on both projects.

The fact that sewer expenses were incurred which were not included in the F. H. A. estimate was due to the fact that prior to 1951 this charge was included in the local taxes but, starting in 1951, was charged separately.

The increase in heating expenses over the F. H. A. estimates was due, in part at least, to the fact that the wrong type of fuel burner was installed in the Earl Apartments. Subsequent to its acquisition of the project, petitioner endeavored unsuccessfully to have the improper equipment replaced.

As of September 24, 1951, and for at least the preceding 3 months, petitioner was making a positive effort in the case of at least the Earl Apartments to provide the project with good management and maintenance.

In the years in question, petitioner had a net profit (unconsolidated) as follows:

| | |
|---|---|
| 1951 | $26,818.76 |
| 1952 | 44,066.61 |
| 1953 | 43,133.95 |

After consolidation with Earl Apartments, Inc., and Spiegel Apartments, Inc., petitioner had a net loss in 1951 of $4,567.50; a net income in 1952 of $12,193.59 before application of a net operating loss from 1951; and a net loss in 1953 of $4,542.72.

The principal purpose of the acquisition by petitioner of Earl Apartments, Inc., and Spiegel Apartments, Inc., was the evasion or avoidance of Federal income tax. No bona fide business purpose was served by the acquisition.

OPINION.

The deficiencies in this case were determined by the respondent on two separate, although related, grounds.

First, in the computation of consolidated net income for the years 1951, 1952, and 1953, the respondent disallowed under section 129 of the 1939 Code, the text of which is set out in the margin,[1] the deduc-

---

[1] SEC. 129. ACQUISITIONS MADE TO EVADE OR AVOID INCOME OR EXCESS PROFITS TAX.

(a) DISALLOWANCE OF DEDUCTION, CREDIT, OR ALLOWANCE.—If (1) any person or persons acquire, on or after October 8, 1940, directly or indirectly, control of a corporation, or (2) any corporation acquires, on or after October 8, 1940, directly or indirectly, prop-

tions attributable to the losses sustained by Earl Apartments, Inc., and Spiegel Apartments, Inc. This disallowance was based on respondent's determination that the acquisition of the two corporations by petitioner had as its principal purpose the avoidance of Federal income tax by securing the benefit of deductions, credits, or other allowances which petitioner would not otherwise have enjoyed.

Second, the respondent determined that Earl Apartments, Inc., and Spiegel Apartments, Inc., were not affiliates, within the intendment of section 141 of the 1939 Code, of petitioner in the years 1951, 1952, and 1953, so as to permit the filing of consolidated returns. The basis for this determination was respondent's finding that there was no business purpose served by the acquisition and holding of the stock of Earl Apartments, Inc., and Spiegel Apartments, Inc., by petitioner in those years, but that such acquisition was solely for tax-reducing purposes.

Petitioner here is a person within the meaning of section 129. Sec. 3797 (a) (1), 1939 Code. It acquired control of the corporations in question after October 8, 1940. It thereby secured the benefit of deductions which it would not otherwise have enjoyed. The sole remaining requirement to be met in order for section 129 to be operative here is that the acquisitions in question had as their principal purpose the evasion or avoidance of Federal income tax.

The respondent having determined that the principal purpose of the acquisition was the avoidance of income tax, the burden is on the petitioner to prove otherwise. *American Pipe & Steel Corporation*, 25 T. C. 351, 366 (1955), affd. 243 F. 2d 125 (C. A. 9, 1957). In the instant case, the petitioner has failed to carry this burden.

---

erty of another corporation, not controlled, directly or indirectly, immediately prior to such acquisition, by such acquiring corporation or its stockholders, the basis of which property, in the hands of the acquiring corporation, is determined by reference to the basis in the hands of the transfer corporation, and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income or excess profits tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed. For the purposes of clauses (1) and (2), control means the ownership of stock possessing at least 50 per centum of the total combined voting power of all classes of stock entitled to vote or at least 50 per centum of the total value of shares of all classes of stock of the corporation.

(b) POWER OF COMMISSIONER TO ALLOW DEDUCTION, ETC., IN PART.—In any case to which subsection (a) is applicable the Commissioner is authorized—

(1) to allow as a deduction, credit, or allowance any part of any amount disallowed by such subsection, if he determines that such allowance will not result in the evasion or avoidance of Federal income and excess profits tax for which the acquisition was made; or

(2) to distribute, apportion, or allocate gross income, and distribute, apportion, or allocate the deductions, credits, or allowances the benefit of which was sought to be secured, between or among the corporations. or properties, or parts thereof, involved, and to allow such deductions, credits, or allowances so distributed, apportioned, or allocated, but to give effect to such allowance only to such extent as he determines will not result in the evasion or avoidance of Federal income and excess profits tax for which the acquisition was made; or

(3) to exercise his powers in part under paragraph (1) and in part under paragraph (2).

The petitioner seeks to defeat the application of section 129 by offering evidence to prove, first, that tax avoidance was not the principal purpose of the acquisition, and second, that a bona fide business motive was the principal purpose.

Petitioner's argument in support of its first proposition is summarized in its brief as follows:

The Petitioner expected no abnormal profits nor did it know whether losses had been or would be sustained by the subsidiaries. All known facts indicated that the operations of the subsidiaries would be successful.

Petitioner argues that its situation at the time of the acquisition was such that a tax avoidance motive could not exist because it had only nominal income and income tax liability and did not expect any abnormal increase in income. Granting that petitioner's income at the time of the acquisition was relatively small and granting that there is no evidence that it expected an "abnormal" increase in income, petitioner has nevertheless failed to demonstrate by this showing that a tax avoidance purpose could not have existed.

Petitioner was a newly reactivated business, and, in the words of Fox, it hoped to grow. Vineland, where petitioner's operations were centered, was a growing city and the demand for housing in the area was so great that it could not be met. As a real estate brokerage concern, petitioner could expect its profits to increase which they in fact did rather substantially.

Additionally, however, the mere fact that an acquiring corporation has a modest income with a consequent small tax liability and no expectation of growth does not as a matter of law negate the existence of a tax avoidance motive. If a corporation with a net income of $10,000 and a Federal tax liability of $3,000 acquires another corporation with the principal purpose of wiping out or significantly reducing its own $3,000 tax, section 129 would be applicable. This is not to say that the amount of a tax saving may not be significant in determining the existence of a tax avoidance purpose. A very small actual or potential tax saving to a taxpayer with a very large regular tax liability may tend to show the improbability of a tax avoidance motive. However, the value of a tax benefit must be measured in relative terms. Thus, a tax saving, small in dollar amount, may loom large in terms of the particular taxpayer's tax liability and form the basis of an avoidance motive.

The petitioner states that Fox could have transferred the stock of the two apartment projects to the Seaboard Fidelity Corporation or to the Credit Rating Services, both of which had larger taxable incomes at the time of the acquisition than did petitioner. From the fact that Fox actually transferred the stock to petitioner, which had the lowest income of the three, petitioner argues that there could not have been an avoidance purpose in the transaction.

Since the evidence indicates it was reasonable to expect petitioner's business and income to grow, this argument lacks validity. Moreover, we do not know in what business Seaboard Fidelity Corporation or Credit Rating Services was engaged. We do not know what operations their corporate charters authorized. We infer from their names that their business activities were less related to the ownership and management of real estate than was that of petitioner, and perhaps completely unrelated to such a business. If this was the case, and petitioner has offered no evidence to the contrary, a transfer of the Earl and Spiegel stock to Seaboard Fidelity Corporation or Credit Rating Services would have been even more lacking in realism than was the actual transfer to petitioner.

In further support of its proposition that the principal purpose of the acquisition in question was not tax avoidance, petitioner maintains, as pointed out above, that it did not know that the two acquired corporations had been sustaining losses or that they would sustain losses subsequent to their acquisition. Petitioner steadfastly maintains that all the facts known to it at the time of acquisition indicated that the operations of the subsidiaries were and would be successful.

We have found that Earl Apartments, Inc., and Spiegel Apartments, Inc., were, in fact, in financial difficulties and operating at a loss at the time of their acquisition by petitioner. The former was actually in default on its mortgage during the 2 months immediately prior to its acquisition by petitioner. Fox, who initially acquired both corporations and almost simultaneously transferred them to petitioner, knew that, of the approximately $16,000 he paid to Harry Spiegel at the time of settlement, some $11,000 went to the mortgagees. He knew this because the checks were made payable to Spiegel and the creditors for the specific purpose of making it possible to trace the money. Fox testified that Spiegel told him that he owed this amount personally and that he believed Spiegel had been diverting funds from the two corporations to his own use. Yet at the same time, either he or petitioner caused the approximately $16,000 to be entered on the books of the two subsidiaries as an account or accounts payable, an action completely inconsistent with the asserted belief that the $16,000 represented personal obligations of Harry Spiegel.

The testimony of Fox, the only witness in the case, in describing the transaction whereby he acquired the stock of the two corporations from Spiegel is unclear and at times inconsistent, although Fox himself conducted the negotiations and the facts of the transaction were peculiarly within his own knowledge. He testified that the approximately $16,000 was reflected on the books of a corporation or corporations as an account or accounts payable. Since petitioner only assigned a book value of $900 to the 9 shares of its own stock

which it transferred to Fox in exchange for his stock in the Earl and Spiegel Apartments, we must assume that petitioner was not at the same time assuming a liability in the neighborhood of $16,000. The incurring of such a liability would have been inconsistent with the value assigned to the stock transferred. This being the case, we have concluded that it was on the books of Earl Apartments, Inc., and Spiegel Apartments, Inc., that the $16,000 was entered as an account or accounts payable.

Fox knew that neither subsidiary had any working capital at the time of their acquisition. Moreover, both subsidiaries had substantial losses in each of the years 1951, 1952, and 1953. With the exception of a sharp increase in the loss of Spiegel Apartments, Inc., in 1953, which was due primarily to a substantial drop in rental receipts, the pattern of the losses of both subsidiaries remained constant throughout the 3-year period. In fact, their aggregate losses for the full year 1951, the first year of their ownership by petitioner, were somewhat larger than in 1952. With the exception of sewer expenses, petitioner has not shown that these losses were the result of events or conditions arising only subsequent to the acquisition. No statements or records of the operation of either corporation have been submitted with respect to the period prior to 1951 (or for later years for that matter). In view of the conceded default in 1950 of at least one of the corporations, in view of a continuous pattern of substantial losses of both corporations from the date of acquisition on, and in the absence of any showing to the contrary, we have found that both corporations were operating at a loss when acquired. Petitioner does not suggest otherwise, but only that it was unaware of that fact at the time of acquisition.

Petitioner asserts that its belief in the financial soundness of the two subsidiaries and its expectation of continued success was based mainly on (1) the fact that most Section 608 projects were operating successfully throughout the United States in general and throughout New Jersey in particular, (2) the fact that the project analyses prepared by F. H. A. with respect to the Earl and Spiegel Apartments estimated that both projects would operate at a profit, and (3) the fact that both projects were fully occupied and had substantial waiting lists at the time of their acquisition.

In determining the weight to be attached to these assertions, it must be borne in mind that Fox, who made the investigation of the two projects prior to their acquisition, had had by his own testimony many years of business experience in the real estate mortgage and related fields.

Petitioner, and its *alter ego* Fox, would have us believe that, since Fox knew that most Section 608 projects were operating successfully, he therefore believed that the Earl and Spiegel Apartments were

operating successfully and would continue to do so. It is obvious that such a conclusion does not follow logically from the stated premise. The argument is totally unconvincing. The most that could have been inferred reasonably from this information was that Section 608 projects were a promising area for investment generally but certainly not that any specific project necessarily represented a sound investment.

Similarly, the project analyses themselves provided no logical basis for the asserted conclusion that the two projects were operating successfully and would continue to do so. The most that could be deduced reasonably from the analyses was that, under their stated assumption as to receipts and expenses, the projects would operate at a profit. Assuming those assumptions to have been reasonable at the time of the preparation of the analyses, there was no basis for concluding that they were still valid at the time Fox and petitioner acquired the two corporations.

In the case of the Spiegel Apartments, the project analysis had been prepared approximately 8 months prior to the time the project was ready for occupancy and approximately 28 months prior to the time it was acquired by Fox and petitioner. The project analysis of the Earl Apartments had been prepared approximately 10 months prior to the time the project was ready for occupancy and approximately 23 months prior to the time it was acquired. The Spiegel Apartments had been operating for 20 months and the Earl Apartments for 13 months at the time of their acquisition. Under the circumstances, we find no support for petitioner's assertion that the project analyses formed a reasonable basis for its belief at the time of acquisition that the two projects were operating successfully and would continue to do so.

Finally, petitioner claims its belief in the financial soundness of the two projects was based in part on the fact that both were fully occupied and had substantial waiting lists. A high percentage of occupancy was certainly a prerequisite to their successful operation. However, in order to be meaningful in terms of actual gross receipts, the degree of occupancy had to be related to the rental level. Fox testified that the rental level was the same as that provided in the F. H. A. analyses and that there was no lowering of rents. If this had been so, then, at least on the gross receipts side of the ledger, the projects would have been operating up to expectations.

When questioned about the official report of an F. H. A. examiner to the effect that in May 1951, some 4 months after their acquisition, the Earl Apartments were renting at a scale considerably lower than that called for by the F. H. A. analysis, Fox simply declared that the examiner must have been mistaken. Furthermore, petitioner has offered no explanation of the report of default submitted by the mort-

gagee to F. H. A. in December 1950, immediately prior to the acquisition, which assigned as the principal reason for the default in the Earl mortgage "reduced income due to rental concessions." Fox testified that prior to the acquisition he had a report prepared by Harry Spiegel's rental agent showing the occupancy and rental of each apartment. This report was not offered in evidence. No books and records of either Earl Apartments, Inc., or Spiegel Apartments, Inc., covering their operations either prior to or subsequent to their acquisition were offered in evidence. Such books and records would be the best evidence of the actual rents. Under the circumstances, we have found that, at least with respect to the Earl Apartments, the rental level for at least a portion of the period involved was lower than the F. H. A. scale.

However, even if we found full occupancy at F. H. A. rental levels, which we do not, such a finding would not support the conclusion that petitioner had a reasonable basis for believing that the two projects were operating successfully and would continue to do so. It is obvious that receipt figures are meaningless insofar as net income is concerned unless accompanied by expense figures. It is inconceivable that an experienced businessman such as Fox would have assumed otherwise. Yet, insofar as the evidence indicates, Fox and petitioner failed to obtain a single shred of information as to the actual expenses of the two corporations prior to their acquisition. We recognize that, in certain types of business which operate typically on a wide margin of profit with expenses playing a relatively unimportant part in the overall success of the operation, a knowledge of receipts alone might offer a fair basis for knowledge of the general profitableness of the business as a whole. Such is not the case here. The very F. H. A. analyses upon which petitioner insists it placed so much reliance showed a relatively small operating margin in each case.

Since both Earl Apartments, Inc., and Spiegel Apartments, Inc., were in fact operating at a loss at the time of their acquisition by petitioner, to support its claim that it actually believed otherwise petitioner must show a reasonable basis for such a belief and not a mere speculative hypothesis without foundation in reality. Petitioner here has failed to do so.

Petitioner likewise has failed to furnish any convincing evidence that the two acquisitions had as their principal motivation a bona fide business purpose.

Petitioner argues that by acquiring the two corporations it would secure annual rental commissions in the neighborhood of $6,000 and annual insurance commissions of about $1,000. The acquisition of the two corporations by petitioner was unnecessary to the objective of securing these commissions. Fox controlled petitioner and when once

he himself had purchased all of the stock of Earl Apartments, Inc., and Spiegel Apartments, Inc., he could thereafter have placed the commissions in the hands of petitioner, if that was the desired objective, without the necessity of transferring the stock to petitioner. Acquisition of the stock by petitioner added nothing of substance to its ability to secure the commissions.

As a further factor of alleged bona fide business purpose, petitioner declared that it anticipated acquiring eventual title to two very valuable pieces of property after the mortgages, with a life of about 34 years, had been paid off. The validity of this argument in turn depends upon the validity of petitioner's asserted belief that the two corporations were and would continue to operate profitably so that the mortgages would be paid off. We have already decided that petitioner has failed to produce any convincing evidence that it had a basis for such a belief. This being the case, petitioner's argument here must also fail.

The entire circumstances surrounding the acquisition by the petitioner of these two corporations fail to support its contention that a bona fide business purpose existed.

The consideration paid for the stock of the two corporations was at best nominal. While petitioner on brief asserts that the decision to acquire the stock of the two corporations was reached "only after a most thorough investigation," the evidence leads inevitably to the opposite conclusion.

As we have seen, neither Fox nor the petitioner saw any operating books of the two corporations prior to their acquisition. Nor does the record suggest that they made any effort to develop such information. Harry Spiegel was the owner and operator of the two corporations and, even if he had had no books and records whatsoever, it would seem reasonable to expect a prospective purchaser of his business to make at least informal inquiry of him concerning its operations. Aside from Spiegel's apparent assurance that both projects were fully occupied, the record fails to disclose that petitioner, either through Fox or otherwise, made any inquiry of Spiegel as to the financial success or lack of it of the two corporations. There is certainly no suggestion that Spiegel or anyone else for that matter actually represented to Fox or the petitioner that the two corporations, or either of them, were operating at a profit.

Under the circumstances, for petitioner to expect us to give serious credence to its assertion that through Fox, a thoroughly experienced businessman, it entered into the transaction in question for a bona fide business purpose requires a degree of naïveté which we do not possess.

The petitioner having failed to carry its burden of proof, the determination of the respondent that the principal purpose of the acquisition of the Earl Apartments, Inc., and the Spiegel Apartments, Inc., by petitioner was the avoidance of Federal income taxes is sustained. It follows that the respondent did not err in disallowing the losses of the two corporations.

The second ground asserted by the respondent in support of its determination of the deficiencies is that Earl Apartments, Inc., and Spiegel Apartments, Inc., were not affiliates of the petitioner within the meaning of section 141 of the 1939 Code so as to permit the filing of consolidated returns in the years at issue.

The provisions of section 141, insofar as here pertinent, are set out in the margin.[2]

In *J. D. & A. B. Spreckels Co.*, 41 B. T. A. 370 (1940), we laid down the rule that where the ownership of a subsidiary's stock by a parent corporation served no business purpose, as distinguished from a tax-reducing purpose, the subsidiary is not an affiliate within the intent of section 141.

We agree with petitioner that the facts of the instant case differ in a number of respects from the facts in *J. D. & A. B. Spreckels Co.*, *supra*. However, the rule of that case is applicable, regardless of distinctions of fact, where the petitioner is unable to show that a business purpose, as distinguished from a tax-reducing purpose, was served by the acquisition in question. We have already discussed at considerable length the evidence presented in this proceeding, and it is unnecessary to repeat that discussion here. After a careful examination of all the evidence, we conclude that the petitioner here has failed to show that a business purpose, as distinguished from a

---

[2] SEC. 141. CONSOLIDATED RETURNS.

(a) PRIVILEGE TO FILE CONSOLIDATED RETURNS.—An affiliated group of corporations shall, subject to the provisions of this section, have the privilege of making a consolidated return for the taxable year in lieu of separate returns. * * *

(b) REGULATIONS.—The Secretary shall prescribe such regulations as he may deem necessary in order that the tax liability of any affiliated group of corporations making a consolidated return and of each corporation in the group, both during and after the period of affiliation, may be returned, determined, computed, assessed, collected, and adjusted, in such manner as clearly to reflect the income- and excess-profits-tax liability and the various factors necessary for the determination of such liability, and in order to prevent avoidance of such tax liability.

(d) DEFINITION OF "AFFILIATED GROUP".—As used in this section, an "affiliated group" means one or more chains of includible corporations connected through stock ownership with a common parent corporation which is an includible corporation if—

(1) Stock possessing at least 95 per centum of the voting power of all classes of stock and at least 95 per centum of each class of the nonvoting stock of each of the includible corporations (except the common parent corporation) is owned directly by one or more of the other includible corporations; and

(2) The common parent corporation owns directly stock possessing at least 95 per centum of the voting power of all classes of stock and at least 95 per centum of each class of the nonvoting stock of at least one of the other includible corporations.

As used in this subsection, the term "stock" does not include nonvoting stock which is limited and preferred as to dividends.

tax-reducing purpose, was served by its acquisition of Earl Apartments, Inc., and Spiegel Apartments, Inc.

It follows that the respondent's determination of deficiencies is, in all respects, sustained.

*Decision will be entered for the respondent.*