**HAWAIIAN TRUST COMPANY, Limited,** a Hawaii corporation, Trustee for the Creditors and Stockholders of Pacific Refiners, Limited, a dissolved Hawaii corporation, Plaintiff,

v.

**UNITED STATES of America,** Defendant.

Civ. No. 1619.

United States District Court D. Hawaii.

Nov. 24, 1959.

Anderson, Wrenn & Jenks, by Marshall M. Goodsill, Honolulu, Hawaii, for plaintiff.

Louis B. Blissard, U. S. Atty., Honolulu, Hawaii, for defendant.

ROSS, District Judge.

While counsel for the plaintiff has shown considerable industry and ingenuity in presenting his arguments, that industry and that ingenuity have not availed to counterbalance the essentially tenuous character of his reasoning.

In contrast, the defendant's position is simple, clear, and based upon elementary logic, as well as being supported by statute law and the applicable Treasury Regulations.

### 1. Statement of the Case.

The plaintiff seeks recovery of $109,-692.18, representing the principal amount of income taxes alleged to have been illegally and erroneously assessed and collected for 1953 and 1955, plus interest paid thereon, amounting to $15,-055.76, or a total of $124,747.94. In addition, the plaintiff claims that it is entitled to interest on the entire amount of principal and interest paid. In other words, there is presented the familiar problem of "interest on interest."

The amounts of the alleged overassessments and overpayments are claimed by the plaintiff to be as follows:

| Year | Principal | Interest | Total |
|------|-----------|----------|-------|
| 1953 | $ 58,472.39 | $11,309.99 | $ 69,774.38 |
| 1955 | 51,219.79 | 3,753.77 | 54,973.56 |
| | $109,692.18 | $15,055.76 | $124,747.94 |

The parties have stipulated that three issues are presented in this case, as follows:

#### I.

Can the net operating loss suffered by Hilo Gas Company, Limited, hereinafter Hilo Gas, in 1950 be carried forward by its parent, Pacific Refiners, Limited, hereinafter Refiners, on a consolidated return basis to 1953?

The plaintiff's position is that, under the plain terms of the statute (Section 141, Internal Revenue Code (hereinafter sometimes the Code) of 1939, 26 U.S.C.A. § 141) and the Consolidated Return Regulations, Refiners is entitled to carry forward the Hilo Gas 1950 loss as a consolidated net operating loss to 1953. It is contended that there was a sound business purpose for the acquisition of control of Hilo Gas by Refiners and that there was no tax evasion or avoidance purpose.

The position of the defendant is that the carry-forward can be denied because the "principal purpose" of the acquisition of control of Hilo Gas was tax evasion or avoidance within the meaning of Section 129 of the Code of 1939, 26 U.S.C.A. § 129, or because there was no "business purpose" for the acquisition or because there was no "economic loss" to the parent corporation.

#### II.

Can Refiners deduct in the year of its liquidation expenses of selling its capital stock?

The plaintiff's position is that these expenses are deductible in the year of complete liquidation.

The defendant contends that these expenses are not deductible in any year.

### III.

Can Refiners deduct in 1955 Territory of Hawaii income taxes allocable to gain from the sale of its properties realized in 1955 but not recognized for Federal income tax purposes by reason of Section 337 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 337?

The plaintiff maintains that the Hawaii income taxes are deductible under Section 164(a) of the Internal Revenue Code of 1954 and that Section 265 of that Code is not applicable.

The defendant insists that Section 265 *is* applicable, and that for this reason the deduction for Territorial taxes was correctly disallowed.

### 2. Stipulation of Facts.

The case was submitted to the Court on a stipulation of facts. Sharply abridged, that stipulation is as follows:

Refiners was organized as a corporation under the laws of Hawaii in 1949. It was dissolved on November 19, 1956, and the plaintiff was appointed Trustee for the creditors and the stockholders.

Refiners had an initial authorized capital of $250,000, represented by 250,000 shares of common stock of the par value of $1 each. Honolulu Gas Company, Limited, hereinafter Honolulu Gas, purchased at par the initial 250,000 shares of common stock of Refiners, and in 1949 distributed such stock as a dividend to the stockholders of Honolulu Gas.

After its organization, Refiners engaged in the merchandising of gas appliances, and commenced the construction of its refinery. To pay for that construction work, it borrowed $650,000 on short-term promissory notes. In May, 1950, Refiners sold to the public an additional 500,000 shares of common stock and $750,000 worth of 15-year, 6%, sinking fund debentures. The net proceeds of this issue were estimated at $1,225,445. In connection with this offering, Refiners incurred expenditures attributable to the issuance of its shares of common stock in the amount of $9,259.74.

In December, 1950, Refiners completed the construction of its refinery.

In April, 1951, Refiners sold an additional 750,000 shares of common stock to the public. The net proceeds from this issue were estimated at $734,400. In connection with this issue, Refiners incurred capital stock expenses of $21,418.-88.

Refiners' principal business was the manufacture and sale of petroleum products and the distribution of butane—a form of liquefied petroleum gas—in Hawaii. The corporation was not a public utility, and none of its business was subject to regulation by the Public Utilities Commission of Hawaii, hereinafter the Commission.

Refiners entered into an oil and butane contract with Standard Oil of California, hereinafter Standard, in 1949, for a period of ten years for the purchase of petroleum and butane. The Hilo Gas Company, Limited, hereinafter Hilo Gas, after its conversion to butane air in 1951, used more than 500,000 gallons of butane annually, accounting for about one-third of the total butane sales of Refiners.

Hilo Gas was organized as a corporation in Hawaii in 1927. It manufactured gas from oil and distributed it through gas mains in Hilo, and was a public utility subject to regulation by the Commission.

In 1948–1949, Hilo Gas was in financial difficulty. In 1950, A. E. Englebright, who was then the general manager of Refiners, was approached by Orlando Lyman, the president and largest stockholder of Hilo Gas, for assistance in solving the problems of the latter company.

The proposition was made that Hilo Gas cease the manufacture of gas from oil and buy butane from Refiners, which Hilo Gas would then distribute through its gas mains in Hilo as a public utility. This would save manufacturing costs and reduce gas rates to a point where

they might be competitive with electric rates.

The feasibility of the Hilo Gas plan depended to some extent on the condition of its gas mains. Englebright sent L. L. Gowans, chief engineer of Honolulu Gas, to Hilo to make a survey. Gowans reported that the gas mains were in adequate condition, and that it would be entirely feasible to distribute butane air mix in the Hilo Gas distribution system without too great a loss in leakage.

On August 7, 1950, Refiners proposed to Lyman that it supply Hilo Gas with butane at 16 cents per gallon. Refiners would also provide equipment and appurtenances for butane air installation at the Hilo plant for about $25,000, to be repaid by Hilo Gas through an additional 1 cent per gallon payment for all butane used in its system. Lyman, however, in addition wished to acquire the franchise for distribution of "Isle-Gas", Refiners' trade name for butane that it distributed in tanks or containers for use by rural customers, throughout the Island of Hawaii at the price quoted for use in the Hilo Gas mains.

After extended negotiations, on October 5, 1950, the Board of Directors of Refiners authorized the purchase by it of all the stock of Hilo Gas.

The Hilo Gas stock was purchased by Refiners rather than by Honolulu Gas, because Refiners, as the distributor of butane, had the primary interest in securing the Hilo market.

On October 25, 1950, the General Manager reported to the directors of Refiners that 96% of the stock of Hilo Gas had been acquired by Refiners—all but 164 shares. Refiners never acquired more than 1,872 of the 1,929 outstanding shares of the 7% preferred stock of Hilo Gas and did not acquire the last minority-owned share of the 8% preferred stock until shortly before the dissolution of Hilo Gas in 1956.

The total cost to Refiners of the Hilo Gas stock was $63,897.20.

Under Hawaiian law, no public utility may dispose of property connected with its duties without first securing from the Commission an "order" authorizing it to do so. Without such order, every such disposition of property shall be void. Section 104–18, Revised Laws of Hawaii 1955.

On October 20, 1950, Hilo Gas filed a petition with the Commission in which it recited that it proposed to sell all its assets, except those related to the appliance sales and liquefied petroleum gas business, to Honolulu Gas for approximately $60,000. The Commission, in an order filed on November 15, 1950, authorized Hilo Gas to sell its utility assets to Honolulu Gas for $64,000.

Hawaiian law requires that the sale of substantially all of the property receive the affirmative vote of three-fourths of all stock issued and outstanding and having voting power. Section 172–30, R.L.H. 1955. The stockholders of Hilo Gas authorized the sale of the Company's utility assets to Honolulu Gas and the sale of the appliance and liquefied petroleum gas business and assets to Refiners. On October 31, 1950, Hilo Gas executed a bill of sale transferring to Refiners for $18,500 the assets relating to the appliance sales and liquefied gas business.

On October 31, 1950, Hilo Gas and Honolulu Gas executed an instrument whereby Hilo Gas conveyed to Honolulu Gas for $46,000 its utility manufacturing plant, etc., and Honolulu Gas assumed the liabilities of Hilo Gas. Possession of these assets was not taken by the purchasers until after October 31, 1950.

On the same day, Hilo Gas sold assets having a basis for tax purposes of $211,-684.90 to Honolulu Gas and to Refiners for $88,754.32. Such consideration consisted of cash in the amount of $46,000, paid by Honolulu Gas, $18,500 in cash paid by Refiners, and assumption of liabilities amounting to $25,254.32 by Honolulu Gas. The utility assets were sold to Honolulu Gas at $122,930.58 less than their net book value, and consisted of "property used in the trade or business" as defined in Section 117(j) (1), Internal Revenue Code of 1939, 26 U.S. C.A. § 117(j) (1).

After the Public Utilities Commission approved the sale of the utility assets of Hilo Gas to Honolulu Gas, the necessary facilities for converting the Hilo system to butane air were ordered. Until April 1, 1951, all of the gas furnished to Hilo was manufactured at the old plant of Hilo Gas.

Hilo Gas had never claimed an obsolescence or abandonment loss for tax purposes on any of the utility assets sold by it to Honolulu Gas on October 31, 1950.

The utility assets sold to Honolulu Gas on October 31, 1950, and abandoned, scrapped or transferred to the Honolulu Division by Honolulu Gas after April 1, 1951, totaled $52,839.65. Utility assets, other than cash, receivables, inventories and supplies, sold to Honolulu Gas on October 31, 1950, that were continued in use in the Hilo operations of Honolulu Gas after April 1, 1951, totaled $113,-635.15.

As a result of the sale of these utility assets to Honolulu Gas for $122,930.58

less than their net book value, Hilo Gas claimed a net operating loss of $117,792.-57 for 1950.

Refiners and Hilo Gas filed consolidated Federal income tax returns for 1950–1953, inclusive. Refiners and Hilo Gas filed separate returns for 1954 and 1955. Both companies filed separate Territorial income tax returns for 1950–1955, inclusive.

In 1950 Refiners suffered a loss of $93,-092. In 1951 it had a net income of $17,-445, and in 1952, $39,147. It did not have to pay any Federal or Territorial income taxes in those years. In 1953 it had a net income before income taxes of $206,397.20 and after income taxes (as reported) of $167,229. In 1954 it has a net income before income taxes of $215,-735.66, and after income taxes (as reported) of $104,977. All the foregoing figures are on an unconsolidated basis.

Hilo Gas filed annual "Corporation Exhibits" required by Territorial Law for 1950–1955. Those Exhibits showed the following:

| Year | Total Income | Total Expenses | Net Income Before Taxes |
|------|-------------|----------------|-------------------------|
| 1951 | $19,294.16 | $18,324.96 | $   969.20 |
| 1952 | 10,732.76 | 10,273.26 | 459.50 |
| 1953 | 8,600.00 | 5,830.71 | 2,769.29 |
| 1954 | 8,600.00 | 6,009.25 | 2,590.75 |
| 1955 | 8,700.00 | 6,063.04 | 2,636.96 |

Hilo Gas was dissolved effective September 18, 1956.

Although Hilo Gas sold to Honolulu Gas its utility assets for $46,000 and the assumption of liabilities, actually it did not sell or distribute all its assets in that year. In fact, it continued its corporate existence and activities until it was dissolved in 1956 by order of the Treasurer of the Territory of Hawaii, supra.

On October 31, 1950, Hilo Gas sold to Honolulu Gas its utility assets for $46,-000 and the assumption of liabilities, supra. On the same date it transferred its merchandise and liquefied petroleum

gas business to Refiners for $18,500. Hilo Gas retained certain assets in addition to the $64,500 cash received from the sale of its properties.

Refiners included the net loss from the sale in October, 1950, of the utility assets of Hilo Gas to Honolulu Gas in computing the net operating loss carryover to subsequent years, in the consolidated income tax returns timely filed for Refiners and Hilo Gas. The Commissioner has disallowed this item, which amounted to $116,405.64, supra. In the explanation for this disallowance, the Commissioner stated:

" * * * it is held that such loss may not be included as a part of a consolidated net loss reported on a consolidated return filed by Pacific Refiners, Ltd., as a parent, and Hilo Gas Company, Ltd., as subsidiary, for the calendar year 1950 since the loss, if any, was sustained in, or was allocable to, the period prior to affiliation and before the consolidation became effective. Accordingly, the net loss, if any, sustained as the result of the sale of the utility assets of Hilo Gas Company, Ltd., to Honolulu Gas Company, Ltd., in the year 1950 may not be claimed as a part of the net operating loss deduction against the income of Pacific Refiners, Ltd. in the year 1953. The deduction claimed of $116,405.64 is, therefore, disallowed."

On June 4, 1957, the plaintiff, as trustee for the creditors and stockholders of Refiners, paid a deficiency of $58,472.-39, together with interest of $11,301.99, assessed against Refiners by the Commissioner for 1953 on account of his disallowance of the carryover to 1953 of the net operating loss suffered by Hilo Gas in 1950 upon the sale of the utility assets to Honolulu Gas.

On August 28, 1957, the plaintiff duly filed a claim for refund for 1953, covering the payment referred to in the preceding paragraph.

On October 23, 1957, a notice of disallowance in full of the plaintiff's claim for refund of $69,774.38 for 1953 was mailed to the plaintiff, and no part of that sum has been refunded to the plaintiff.

On December 6, 1955, the refinery facilities of Refiners were sold to Standard, and the Isle-Gas business and assets were sold to Honolulu Gas on December 31, 1955. Refiners was dissolved by order of the Territorial Treasurer on November 19, 1956. No gain or loss to Refiners was recognized on the sale of its assets to Standard and Honolulu Gas, pursuant to Section 337 of the Internal Revenue Code of 1954.

In its tax return for 1955, Refiners claimed a deduction for organization expenses of $43,163.48. Included therein was the amount of $30,678.62, relating to expenses in connection with the issue of capital stock, $9,259.74 and $21,418.88 in 1951. The Commissioner's Appellate Division disallowed this claim, stating that "these expenses incurred in marketing your capital stock do not constitute organization expenses, but serve to reduce the proceeds derived from the sale of the stock and are properly chargeable against the paid-in capital."

In its 1955 income tax return, Refiners claimed a deduction for accrued territorial net income taxes of $67,648.77, based on the net income reportable for territorial net income tax purposes. The income included (1) the gain from the sale of Isle-Gas business and related assets to Honolulu Gas in December, 1955, and (2) the gain from the sale of refinery facilities and related assets to Standard. The Commissioner has disallowed that portion of the Territorial net income tax allocable to the gain from the sale of the foregoing assets, under the provisions of Section 265 of the Internal Revenue Code of 1954. The Commissioner stated that that Section "prohibits the deduction of expenses allocable to income exempt from federal income tax." The amount of the total Territorial net income tax of $74,408.15, allocable to these gains and disallowed by the Commissioner for Federal income tax purposes, was $61,061.59.

The Commissioner assessed a deficiency of $51,468.20, plus interest of $3,850.-97, against Refiners for 1955, principally because of his disallowance of the capital stock expense—$30,678.62, supra—and his disallowance of the 1955 territorial income taxes—$61,061.59, supra. The plaintiff paid the entire amount of that deficiency, in installments.

On August 28, 1957, the plaintiff duly filed a claim for refund with the District Director of Internal Revenue for $51,-219.79, plus interest of $3,753.77, or a total of $54,973.56. On October 23, 1957, a notice of disallowance in full of the

plaintiff's claim for the above amount was mailed to the plaintiff by the District Director. No part of the above claim for refund has been paid to the plaintiff.

### 3. The Plaintiff's Argument.

Hilo Gas, Refiners' subsidiary, suffered a net operating loss in 1950, which Refiners is entitled to carry forward as a consolidated net operating loss to 1953.

Under the plain terms of the statute and regulations, Refiners is entitled to include the Hilo Gas loss on the sale of its utility assets in its consolidated net operating loss for 1950, and to carry it forward as a consolidated net operating loss to 1953.

A deductible loss was sustained on the sale of utility assets by Hilo Gas to Honolulu Gas in 1950.

The Hilo Gas loss was sustained *after* affiliation with Refiners, not before. Hilo Gas could not have claimed an abandonment loss or an obsolescence deduction for the pre-affiliation period.

### II.

The expenses of selling Refiners' capital stock are deductible in the year of liquidation.

It is established that the organization expenses of a corporation may be deducted in the year of dissolution when all assets are disposed of and nothing remains but winding up.

Capital stock costs here involved are not salesmen's commissions, but are ordinary out-of-pocket expenses—attorneys' and accountants' fees, printing expenses, and charges of the stock subscription agent. There is no rational way of distinguishing these expenses from other organization expenses, and they should be allowed as a deduction when the corporation liquidates.

### III.

Territorial income taxes on capital gains realized in 1955 are deductible.

It has been stipulated that no gain or loss to Refiners was recognized on the sale of its assets to Standard and Honolulu Gas, pursuant to Section 337, Internal Revenue Code of 1954.

Section 164(a) provides that, except as otherwise provided in this section, there shall be allowed as a deduction taxes paid or accrued within the taxable year.

Refiners is entitled to the deduction for Territorial taxes for 1955.

4. The 1950 Book Loss Suffered by Hilo Gas in the Sale of Its Assets to Refiners Is Not Available to the Latter as a "Net Operating Loss Carryover."

This Court believes that the defendant is correct in its contention that the Commissioner's action in disallowing the claimed "loss carryover" was correct.

Refiners should be denied the benefit of the Hilo Gas loss through the filing of consolidated returns, since Refiners has not established that "the principal purpose for" the acquisition of Hilo Gas was not for "evasion or avoidance of Federal income * * * tax."

Section 129 of the Internal Revenue Code of 1939 is explicit on the subject:

"(a) *Disallowance of deduction, credit or allowance.* If (1) any person or persons acquire, on or after October 8, 1940, directly or indirectly, control of a corporation, or (2) any corporation acquires, on or after October 8, 1940, directly or indirectly, property of another corporation, not controlled, directly or indirectly, immediately prior to such acquisition, by such acquiring corporation or its stockholders, the basis of which property, in the hands of the acquiring corporation, is determined by reference to the basis in the hands of the transferor corporation, *and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income or excess profits tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance*

644

*shall not be allowed."* (Emphasis supplied.)

Quite aside from Section 129, however, Section 141 of the Code of 1939, which extends the privilege of making consolidated returns to affiliated groups, may not be utilized to distort income by acquiring a "loss corporation" for a nominal consideration, and then using such corporation's losses to avoid taxes.

The total cost of the Hilo Gas stock to Refiners was $63,897.20. Refiners by its purchase acquired "95% or more" of the outstanding capital stock of Hilo Gas. At a hearing before the Commission on October 26, 1950, K. A. Conningham, assistant treasurer of Refiners, testified that his company had purchased approximately 95% of the capital stock of Hilo Gas from various stockholders, and that the acquisition was completed "about ten days ago."

On October 31, 1950, Hilo Gas sold assets having a basis for tax purposes of $211,684.90 to Honolulu Gas and to Refiners for $88,754.32.

The defendant argues with much force that there is here presented the question whether the acquisition for $63,897.20 of 95% of the stock of a corporation which shortly afterward was sold for assets of $88,754.32 entitles Refiners to the carryover of a $117,792.57 loss attributable to the sale of those same assets.

The officials of Refiners did not know what the book value of the Hilo Gas assets was, and the Hilo Gas books were not made available to Refiners until after the decision had been made to purchase the Lyman and Hutchinson stock.

As a matter of fact, however, Hilo Gas lost money in 1948 and 1949, and was in financial difficulty. In such a situation, it has been held that the principal purpose of the acquisition was the avoidance of Federal income taxes.

In Elko Realty Company v. Commissioner, 29 T.C. 1012, affirmed 3 Cir., 1958, 260 F.2d 949, 950, the Tax Court had sustained the Commissioner's determination that the principal purpose of the acquisition of the two corporations by the taxpayer was the avoidance of Federal income taxes, that the deduction of their losses from the taxpayer's income was accordingly forbidden by section 129(a), supra, and that the two corporations were in any event not affiliates of the taxpayer privileged to join in a consolidated return under Section 141, supra, since the taxpayer's acquisition of them served no business purpose, as distinguished from a tax-reducing purpose.

In such a situation, the Court of Appeals said:

"It will be seen that the question upon which this case turns is a purely factual one, namely, whether the taxpayer acquired the two corporations in question for a bona fide business purpose or, as the Tax Court found, principally in order to reduce or avoid income taxes on its own income. The evidence is discussed and the facts are found in the opinion filed in the Tax Court by Judge Train, 29 T.C. 1012, and will not be detailed here. We need merely say that our examination of the evidence satisfies us that the findings of the Tax Court have substantial evidence to support them and cannot be held to be erroneous."

An examination of the opinion of the Tax Court in that case discloses facts similar to those at bar. Harold J. Fox was Elko Realty's vice president, executive head, and owner of about 80% of its stock. Harry Spiegel was the owner and operator of the two acquired corporations—Spiegel Apartments, Inc., and Earl Apartments, Inc.

On January 1, 1951, Fox acquired 324 shares of the common stock of Spiegel Apartments and 440 shares of the common stock of Earl Apartments. The shares in question represented the only outstanding common stock of both corporations.

The respondent Commissioner having determined that the principal purpose of the acquisition was the avoidance of income tax, the burden was on

the petitioning taxpayer to prove otherwise.

The two corporations were operating at a loss at the time of their acquisition, and continued to operate at a loss. The taxpayer corporation filed consolidated returns with the Spiegel and Earl corporations for 1951, 1952, and 1953, and attempted to deduct their losses.

Commenting upon the evidence adduced to show a business purpose, the Tax Court, in 29 T.C. at page 1025, observed:

"As we have seen, neither Fox nor the petitioner saw any operating books of the two corporations prior to their acquisition. Nor does the record suggest that they made any effort to develop such information. Harry Spiegel was the owner and operator of the two corporations and, even if he had had no books and records whatsoever, it would seem reasonable to expect a prospective purchaser of his business to make at least informal inquiry of him concerning its operations, Aside from Spiegel's apparent assurance that both projects were fully occupied, the record fails to disclose that petitioner, either through Fox or otherwise, made any inquiry of Spiegel as to the financial success or lack of it of the two corporations. There is certainly no suggestion that Spiegel or any one else for that matter actually represented to Fox or the petitioner (Elko Company) that the two corporations, or either of them, were operating at a profit.

"Under the circumstances, for petitioner to expect us to give serious credence to its assertion that through Fox, a thoroughly experienced business man, it entered into the transaction in question for a bona fide business purpose requires a degree of naivete which we do not possess."

Finally, it is well settled that "Unquestionably the burden of proof is on the taxpayer to show that the Commission-er's determination is invalid." Helvering v. Taylor, 1935, 293 U.S. 507, 515, 55 S.Ct. 287, 291, 79 L.Ed. 623, and cases there cited.

In the instant case, as we have seen, the taxpayer has fallen far short of discharging that burden.

5. Expenses Connected with the Issuance of Stock Are Not Deductible in the Year of a Corporation's Dissolution; They Cannot Constitute a Charge upon Income.

In the tax return for 1955, Refiners claimed a deduction for "organization expenses" of $43,163.48. Included therein was $30,678.62 relating to expenses in connection with the issuance of capital stock in 1951 and 1952. The Commissioner disallowed this latter item as not constituting organization expenses.

It is hornbook law, of course, that the mere fact that an expenditure is made does not entitle the taxpayer to a deduction. Since Congress has the power to prescribe deductions, the right to such a diminution must come within some applicable provision of the statute, else it does not exist. And the provision relied upon, being a matter of legislative "grace," must be "clear." New Colonial Ice Co. v. Helvering, 1934, 292 U.S. 435, 440, 54 S.Ct. 788, 78 L.Ed. 1348.

In Corning Glass Works v. Lucas, 1929, 59 App.D.C. 168, 37 F.2d 798, 799, 68 A.L.R. 736, certiorari denied 1930, 281 U.S. 742, 50 S.Ct. 348, 74 L.Ed. 1155, the appellant entered into a contract with certain bankers, under which the latter agreed to purchase at a price of $100 per share, and accrued dividends, any part of an issue of $3,000,000 preferred stock not taken by stockholders, the bankers to receive for their services, the sum of $240,000. The appellant, on account of these payments to the bankers, sought in its income tax returns to deduct $6,000 from its gross income for 1921 and $236,000 from its gross income for 1922.

The Court quoted extensively from Simmons Co. v. Commissioner, 1 Cir., 1929, 33 F.2d 75, 76, where it was observed:

"While expenses for organization or for obtaining additional capital are frequent in growing and successful enterprises, we think it clear that they are not 'ordinary and necessary expenses' in the productive operations of such concerns within the meaning of the tax laws."

The District of Columbia appellate court then proceeded to analyze the expenditure in that case, saying:

"In the instant case, appellant sold to Estabrook & Co. (the bankers) preferred stock of the value of $3,000,000 at a discount of $8 per share; so that appellant received, not $3,000,000, but $2,760,000; in other words, $92 per share. The effect of this transaction was to reduce by the amount of $240,000 the capital available to appellant. In other words, it represents a *capital* expenditure, and should be charged against the proceeds of the *stock*, and not be recouped out of operating earnings. The regulations and rulings of the Treasury Department have consistently been to the effect that expenses incident to the sale of the capital stock of a corporation are not '*ordinary and necessary expenses incurred in carrying on the business' of such corporation.*" (Emphasis supplied.)

■■ In summary, costs of marketing stock are not deductible in the year of organization; or as ordinary and necessary business expenses when incurred; and they are not deductible in the year of dissolution. In a word, they are not deductible at any time.

The amount of $30,678.62 was properly disallowed by the Commissioner.

6. Refiners Cannot Claim a Deduction on Its 1955 Federal Income Tax Return for Territorial Income Taxes Allocable to Gain from the Sale of Its Properties. Such Gain Is Not Recognizable for Federal Tax Purposes.

■ In December, 1955, in accordance with a plan of complete liquidation, Refiners sold all its assets to Standard and Honolulu Gas. No gain or loss to Refiners was recognized on that sale for Federal tax purposes, pursuant to Section 337 of the Code of 1954. The total territorial income tax paid by Refiners for 1955 was $74,408.15. The Commissioner disallowed the portion of the Territorial net income tax allocable to the gain from the sale of the foregoing assets, stating that Section 265 of the Code of 1954 "prohibits the deduction of expenses allocable to income exempt from Federal income tax." The amount of the total territorial net income tax of $74,408.15 allocable to these gains and disallowed by the Commissioner for Federal income tax purposes, was $61,061.59.

Section 265(1) of the Code of 1954 reads as follows:

"No deduction shall be allowed for—

"(1) *Expenses.*—Any amount otherwise allowable as a deduction which is allocable to one or more classes of income other than interest (whether or not any amount of income of that class or classes is received or accrued) wholly exempt from the taxes imposed by this subtitle, or any amount otherwise allowable under section 212 (relating to expenses for production of income) which is allocable to interest (whether or not any amount of such interest is received or accrued) wholly exempt from the taxes imposed by this subtitle."

Section 1.265-1(b) of the Treasury Regulations reads as follows:

"Section 1.265-1 *Expenses relating to tax exempt income.*

\* \* \* \* \*

"(b) *Exempt income and nonexempt income.*

"(1) As used in this section, the term 'class of exempt income' means any class of income (whether or not any amount of such class is received or accrued) wholly exempt from the taxes imposed by subtitle A of the Internal Revenue Code of 1954. For

the purposes of this section, a class of income which is considered as wholly exempt from the taxes imposed by subtitle A includes any class of income which is—

"(i) Wholly excluded from gross income under any provision of subtitle A, or

"(ii) Wholly exempt from the taxes imposed by subtitle A under the provisions of any other law.

"(2) As used in this section the term 'nonexempt income' means any income which is required to be included in gross income."

From the foregoing, it is apparent that there are only two classes of income involved; taxable income and exempt income, the latter being defined as that which is not required to be included in gross income.

As we have seen, it is agreed that "No gain or loss to Refiners was recognized on the sale of its assets to Standard and Honolulu Gas," under the provisions of Section 337 of the Code of 1954. Accordingly, it must qualify as exempt income. Since the gain is not included in Refiners' income, it follows that there is no basis for allowing a deduction for the expenses—that is to say, the Territorial tax—related to such income.

This Court cannot go along with counsel's effort to escape this logic.

Without laboring the point further, the Court holds that the Commissioner correctly disallowed the claimed deduction for Territorial taxes paid, since they relate to an income-source of Refiners that is exempt from tax under Section 265(1) and the applicable Treasury Regulations, supra.

### 7. Conclusion

In summary, the Commissioner's disallowance of the loss on the sale of the Hilo Gas assets and his disallowance of the claimed deductions for organization expenses and Territorial tax, were correct.

Accordingly, this Court concludes that the plaintiff should take nothing by its complaint, and that the defendant should have its costs. It is therefore,

Ordered, that the defendant have judgment against the plaintiff, together with its costs in this action incurred.

Counsel for defendant is directed to prepare and lodge with the Court findings of fact and conclusions of law, and form of judgment which when adopted and filed will constitute the findings, conclusions and judgment of this Court.